IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ARCH-CON CORPORATION, | § § | |
| *Plaintiff*, | § § § | 5-18-CV-00821-OLG |
| vs. | § § | |
| ARCHCON ARCHITECTURE, LIMITED, ARCHCON DESIGN BUILD, AND DALLENBACH ENTERPRISES, LLC; | § § § § § | |
| *Defendants*. | § § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable Chief United States District Judge Orlando Garcia:**

Before the Court is Plaintiff Arch-Con Corporation d/b/a Arch-Con Construction Co.'s request for a preliminary injunction, originally subsumed within its Amended Complaint. *See* Dkt. No. 5. The District Court construed the Amended Complaint as including a Motion for Preliminary Injunction, *see* Dkt. Nos. 12 & 41, and the District Court referred that Motion to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(C). *See* Dkt. No. 42. The Court has federal question jurisdiction over this case brought pursuant to the Lanham Act, 15 U.S.C. § 1051, *et seq.*, and supplemental jurisdiction over Plaintiff's related state law claims. *See* 28 U.S.C. §§ 1331, 1367.

On January 18, 2019, the undersigned held an evidentiary hearing to address Plaintiff's Motion for Preliminary Injunction, and all parties appeared through counsel of record. For the reasons discussed below, the undersigned recommends that Plaintiff's Motion, Dkt. No. 5, be **DENIED**. In making this recommendation, the undersigned has considered the evidence

presented and arguments of counsel, as well as the briefing submitted by the parties in advance of the hearing, *see* Dkt. Nos. 15, 16, 23, 52-54. The undersigned has also considered the January 30 letter submitted by Plaintiff without leave of Court. *See* Dkt. No. 58. The undersigned could have struck this filing; it is not in compliance with the rules, which do not contemplate or countenance such filings. But given that this report and recommendation will soon be before the District Court, where Plaintiff would likely raise the matters included in the January 30 letter, the undersigned will consider and address the letter here. That said, the undersigned declines to consider any evidence submitted by Plaintiff in the January 30 letter that was not properly placed in the record either prior to or during the preliminary injunction hearing, and the undersigned likewise declines to draw any inferences that rely on any such new evidence and are not properly drawn solely from the evidence in the record.

## I. Factual and Procedural Background

*The Parties*. Plaintiff Arch-Con Corporation is a Texas-based company that provides commercial design and construction services for real estate developers and building owners. *See* Scheurich Test. & Dkt. No. 16 at 18. Plaintiff was originally incorporated by Chief Executive Officer Michael Scheurich in June 2000 under the name "Arch ● Con Inc." *See* Scheurich Test. & Dkt. No. 14-15. In September 2000, Scheurich amended the articles of incorporation to rename the company "Arch-Con Corporation." *Id*. According to Scheurich, he conceived of the name "Arch-Con" by combining abbreviations for the words "Architecture" and "Construction." *See* Scheurich Test. On September 11, 2002, two years after its formation, Plaintiff began doing business as "Arch-Con Construction Co." Plaintiff has continually used either the mark "Arch ● Con" or "Arch-Con" since June 2000. *See id.*

Plaintiff provides, depending on a client's needs, the following three types of services: (1) design-build—Plaintiff works on the project from its inception, subcontracting with an architecture firm to provide architectural drawings; (2) design-assist—Plaintiff performs the construction and also works with the client's retained architect to assist with pre-construction preparation such as budget, scheduling, and certain aspects of the design; and (3) construction-only—Plaintiff is only involved in the construction process. *See id.* Although Plaintiff assists with design services under the first two business models, it is not registered with the Texas Board of Architectural Engineers or the Texas Board of Professional Engineers. *See id.* Accordingly, Plaintiff never draws or stamps any drawings for a project. *See id.*

What began for Plaintiff as a small, one-person Houston-based company is now a large multi-million-dollar company with offices in Houston and Dallas, and an anticipated office to open in Los Angeles. *See id.* Plaintiff currently performs large-scale construction services in a variety of industries, including corporate office and interiors, retail, healthcare, industrial, and multi-family projects primarily in and around the Houston and Dallas areas, College Station, and San Antonio. *See id.* The company has over 150 employees and approximately 550 clients. *See id.* In 2018, Plaintiff had revenues of approximately $375 million, and projects $550 million in revenues in 2019. *See id.*

Defendant Archcon Design Build Ltd. is a limited partnership formed in April 2003 by licensed architect Jeffrey Scott Dallenbach and contractor Shane Davis to provide in-house architectural and construction services. *See* Dallenbach Test.; *see also* Dallenbach 2nd Decl. ¶ 3 (Dkt. No. 16-18 at 13-14). *See id.* Similar to Scheurich, Dallenbach and Davis conceived of the name "Archcon" by combining abbreviations for the words "Architecture" and "Construction." *See* Dallenbach Test. Beginning in June 2006, Archcon Design Build became inactive when

Davis took over his father's construction company. *See* Dallenbach Test.; *see also* Dallenbach 2nd Decl. ¶ 5. According to Dallenbach's credible testimony at the January 18 hearing, Archcon Design Build has not performed any architectural design or construction services or generated any revenue since that time. *See* Dallenbach Test.; *see also* Dallenbach 2nd Decl. ¶¶ 5-6. It has also never maintained a website or paid for advertising. Dallenbach 2nd Decl. ¶ 6.

Defendant Archcon Architecture, Ltd. is a Texas limited partnership formed on June 15, 2005 by Dallenbach. *See* Dallenbach Test.; *see also* Dallenbach 1st Decl. ¶ 4 (Dkt. No. 16-2 at 3-9). In contrast to both Defendant Archcon Design Build and Plaintiff Arch-Con Construction, Defendant Archcon Architecture is an *architecture-only* firm, which solely offers architectural design and consulting services to clients throughout the country. *See* Dallenbach Test.; *see also* Dallenbach 1st Decl. ¶¶ 4, 7. Dallenbach credibly testified at the hearing that (1) in forming Archon Architecture he agreed to never compete with his former business partner Davis in the construction space, (2) he has always honored this "gentleman's agreement," and (3) he has no intention of performing construction work in the future. *See* Dallenbach Test. Archcon Architecture only has two employees, performs the vast majority of its work in the self-storage industry, and has advertised its services on the internet continuously since at least May 9, 2008, using the domain name "wwww.archonarchitecture.com." *See id.*; *see also* Dallenbach 1st Decl. ¶ 6.

*Events Giving Rise to the Litigation*. Plaintiff and Defendants were not aware of each other for the past 13 years, until the events giving rise to this litigation began. *See* Scheurich & Dallenbach Test. Plaintiff first became aware of Defendants' existence in "early 2018" after its President's father saw a sign for Archcon Architecture at a construction site. *See* Cooper Decl. (Dkt. No. 53). Subsequently, one of Plaintiff's high-profile clients—Hines—expressed initial

confusion about whether Plaintiff was affiliated with Archcon Architecture. *See* Scheurich Test. A quick call to Scheurich, however, dissipated any confusion. *See id.* Several architects with whom Plaintiff subcontracts also expressed initial concern that Plaintiff was entering into the architecture space. *See id.*

Things changed after Plaintiff became aware of Defendants' existence. On March 15, 2018, more than 18 years after Plaintiff purportedly began using its "Arch-Con" mark in commerce, Plaintiff filed an Application for Registration of a Trade or Service Mark with the Texas Secretary of State, seeking protection for the mark "Arch-Con." *See* Dkt. No. 16 at 50-56. According to the registration, Plaintiff offers "commercial building design and construction services" and first began using the mark in Texas on June 26, 2000. *See id.* The Texas Secretary of State registered the word-only mark "Arch-Con" that same day. *See id.* Approximately three months later, on June 4, 2018, Plaintiff filed an application in the United Patent and Trademark Office for the mark "Arch-Con." *See* Dkt. No. 16 at 59-63. Plaintiff's federal trademark application is currently pending.

On June 6, 2018, Plaintiff demanded that Defendants cease using its "Arch-Con" mark. *See* Am. Compl. ¶ 7. Defendants' subsequent refusal led Plaintiff to initiate this action on August 10, 2018. *See id.*; *see also* Orig. Compl. Plaintiff brings claims against Defendants for trademark infringement, unfair competition, false advertising, and trademark dilution under the Lanham Act, *see* 15 U.S.C. § 1125, as well as state law claims of unfair competition, common law trademark infringement, and tortious interference. *See* Am. Compl. Defendants in response seek a declaratory judgment that the term "Arch-Con" is not a legally protectable mark. *See* Dkt. No. 14. Defendants also request cancellation of Plaintiff's Texas registered trademark. *See id.*

By and through its Original and Amended Complaint Plaintiff seeks both temporary and preliminary injunctive relief. *See* Dkt. Nos. 1, 1-2, & 5. Specifically, Plaintiff Arch-Con seeks an order requiring Defendants to:

> Cease using Arch-Con's Trademarks, and any other mark that is confusingly similar to any of Arch-Con's Trademarks, including, but not limited to the ARCHCON, ARCHCON ARCHITECTURE, and ARCHCON DESIGN BUILD names; cease using Arch-Con's Trademarks, or any other mark that is likely to cause confusion, in any manner that violates Arch-Con's rights; and modify all of Defendants' domain and internet sites and names, signage, advertising, social media usage, product packaging, and promotional material to eliminate infringement of Arch-Con's Trademarks and any confusingly similar mark.

Am. Compl. at 17. Plaintiff further requests that the Court order Defendants to "[d]estroy all infringing works, business materials, brochures, web pages, advertising, signage, logos, invoices, business cards, business materials, sales decks, and the like within Defendants' care, custody, or control that violate Arch-Con's rights." *Id.*

The District Court twice denied Plaintiff's request for a temporary restraining order on the grounds that it failed to clearly satisfy Rule 65(b)'s requirements. The Court, however, ordered the parties to brief whether a preliminary injunction is warranted. *See* Dkt. Nos. 3 & 12. The parties subsequently briefed the issue focusing *solely* on Plaintiff's federal and Texas trademark infringement claims. *See* Dkt. Nos. 15, 16, & 23. On October 31, 2018, the District Court referred the matter to the undersigned to conduct an evidentiary hearing and to issue a recommendation, *see* Dkt. No. 41. A hearing was originally set to occur on November 15, *see* Dkt. No. 42, however, it was subsequently continued to January 18, 2019, at Plaintiff's request. *See* Dkt. Nos. 43, 44 & November 13 text order.

**II.  Analysis**

To obtain the requested injunctive relief, Plaintiff must "clearly carry the burden of persuasion" on each of the following four requirements, as set forth in *Canal Authority of State*

*of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974): (1) a substantial likelihood of success on the merits; (2) a substantial threat that irreparable injury will result if the injunction is not granted; (3) the threatened injury outweighs any harm that may result from the injunction issued against the Defendants; and (4) granting the preliminary injunction will not disserve the public interest. *Id*. at 572; *see also Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 371 (5th Cir. 2008). "A preliminary injunction is an 'extraordinary remedy' and should only be granted if the [P]laintiff[] ha[s] clearly carried the burden of persuasion on all four requirements." *Nichols*, 532 F.3d at 372. Given the absence of evidence sufficiently establishing these four factors, as detailed below, the undersigned recommends that Plaintiff's Motion be denied.

*Factor 1: Substantial Likelihood of Success on the Merits*. Based on the argument and evidence presented, Plaintiff has failed to establish a likelihood of success on the merits sufficient to warrant the requested preliminary injunction. To make such a showing, a movant must present a prima facie case, but need not prove entitlement to summary judgment. *See, e.g.*, *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). Courts look to the standards of substantive law when determining whether this requirement has been met. *See, e.g.*, *Miss. Power & Light Co. v. United Gas Pipeline Co.*, 760 F.2d 618, 622 (5th Cir. 1985).

To prevail on a claim for trademark infringement under either the Lanham Act or Texas common law, Plaintiff must show that (1) it owns a legally protectable mark in the name "Arch-Con" and (2) Defendants' use of the mark creates a likelihood of confusion as to source, affiliation, or sponsorship. *See Viacom Int'l v. IJR Capital Invs., L.L.C.*, 891 F.3d 178, 185 (5th Cir. 2018). Because Plaintiff has registered the mark with the Texas Secretary of State, there is a prima facie rebuttable presumption that the mark is valid and exclusive to Plaintiff in connection

with the services specified in the certificate of registration. *See Persha v. Armour & Co.*, 239 F.2d 628, 630 (5th Cir. 1957); *Hot-Hed, Inc. v. Safehouse Habitats (Scotland), Ltd.*, 333 S.W.3d 719, 730 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (citing Tex. Bus. & Com. Code Ann. § 16.060(c)). This presumption may be overcome by establishing the generic nature of the mark. *See Hot-Hed, Inc.*, 333 S.W.3d at 730; Tex. Bus. & Com. Code Ann. § 16.064(a)(4)(E). But here, at this early stage in the proceedings, the undersigned need not address the presumption of validity with respect to Plaintiff's mark because Plaintiff's arguments fall short at the second required showing for infringement, the likelihood of confusion.

The evidence reveals, at least at this juncture, that Defendants' use of the mark creates at most a "mere possibility of confusion," as opposed to the required "probability of confusion." *See Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008). Accordingly, Plaintiff cannot show a substantial likelihood of success on its infringement claim sufficient to warrant extraordinary injunctive relief. As discussed further next, evaluating the "digits" of confusion reveals the shortcomings of Plaintiff's arguments on the likelihood of confusion.

Courts "asses the likelihood of confusion using a nonexhaustive list of so-called 'digits of confusion,' which include:

> (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, (7) any evidence of actual confusion, and (8) the degree of care exercised by potential purchasers."

*Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 453 (5th Cir. 2017) (quotations, ellipses, and brackets omitted). "These digits are flexible: They do not apply mechanically to every case and can serve only as guides, not as an exact calculus." *Springboards To Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 812 (5th Cir. 2019), *as revised* (Jan.

29, 2019) (quotations omitted). Accordingly, the undersigned has considered the following two principles while applying these digits: (1) "the application of each digit in light of the specific circumstances of the case"; and (2) "the mark[] in the context that a customer perceives [it] in the marketplace." *Id.* (quotations omitted).

        1.    <u>Type of Mark.</u> The discussion begins with the type of mark in question. "This digit of confusion refers to the strength of the mark along the generic to arbitrary distinctiveness continuum." *Id.* (quotations omitted). Defendants have introduced evidence demonstrating multiple third-party uses of some variation of the mark, either in the construction industry or elsewhere. "All third-party use of a mark, not just use in the same industry as a plaintiff, may be relevant to whether a plaintiff's mark is strong or weak." *Smack Apparel Co.*, 550 F.3d at 479.

In Texas there are at least seven entities that currently use, or have used within the past five years the letters "Archcon," "Arcon," or "Archicon" in a corporate name, and there are six other such entities located throughout the country. *See* Dkt. No. 15 at 10-11. Although this amount of third-party use may not necessarily be categorized as extensive,[1] it does suggest that the mark has been somewhat diluted in the marketplace. *See Springboards*, 912 F.3d at 815 (categorizing the presence of "numerous" other similar products, including in seven other locations in Texas and Denver, as "widespread" third-party use and explaining that such use "suggests that consumers will not associate the junior mark's use with the senior mark user"); *Minturn Advert., Inc. v. Hermsen Design Assocs., Inc.*, 728 F. Supp. 430, 433 (N.D. Tex. 1990) (fact that ten registered trademarks included UPC symbols and a "number" of organizations

---

[1] *Cf. Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316 (5th Cir. 1981) (fact that over 4,400 businesses registered with the Florida Secretary of State used the word "Sun" in their names and of those businesses, 25 were active financial institutions constituted "impressive evidence" that there would be no likelihood of confusion between the companies).

incorporated these symbols diluted the strength of the mark and entitled it to a narrower range of protection); *cf. Armco, Inc. v. Armco Burglar Alarm Co., Inc.,* 693 F.2d 1155, 1159-60 (5th Cir. 1982) (noting that the arbitrariness of a mark combined with an absence of third-party use contributes to strength of mark).

Plaintiff, for its part, argues that the mark is suggestive because the term "Arch-Con" does not appear in any dictionaries, and clients regularly inquire about the origin of the name. *See* Dkt. No. 23 at 4 & Dkt. No. 54. But even assuming solely for purposes of this report and recommendation that the mark is suggestive—which seems somewhat of a stretch given all the totality of the circumstances, in light of the documented third-party use—this first digit is at most neutral.

        2.      <u>Similarity between the marks.</u> "Assessing the similarity of the competing marks requires consideration of the marks' appearance, sound, and meaning." *Streamline*, 851 F.3d at 454 (quotations omitted)). "The more similar the marks, the greater the likelihood of confusion." *Id.* When assessing similarity of names, "it is necessary to consider the full names of the parties to determine whether the defendant's name invites or avoids confusion." *Safeway Stores, Inc. v. Safeway Ins. Co.*, 657 F. Supp. 1307, 1314 (M.D. La. 1985), *aff'd sub nom.*, 791 F.2d 929 (5th Cir. 1986); *see also CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 271 (4th Cir. 2006) ("If one of two similar marks is commonly paired with other material, that pairing will serve to lessen any confusion that might otherwise be caused by the textual similarity between the two marks."). Here, while the marks appear at first blush to be quite similar and are even phonetically pronounced the same, the evidence reveals that Plaintiff

generally[2] uses the term "Arch-Con" combined with the term "Construction," while Defendant Arch-Con Architecture uses the term "Archon" combined with the term "Architecture." Further, unlike Defendants, Plaintiff generally uses a stylized letter A" in its logo:

*Compare*  *with*

Accordingly, on the whole, this factor is likely also, at most, neutral.

        3.      <u>Product Similarity</u>. "The greater the similarity between the products and services, the greater the likelihood of confusion." *Streamline*, 851 F.3d at 454 (quotations omitted). Here, although Defendant Archcon Design Build at one point offered services similar to those offered by Plaintiff, Archcon Design Build has not been an active business (nor has the mark been used in that context) for at least a decade. *See Dallenbach Test.; see also* Dallenbach 2nd Decl. ¶ 5. Defendant Archcon Architecture, moreover, does not offer any construction capabilities, and instead is purely an *architecture* firm that predominantly provides services in a single niche industry—the ministorage industry. *See* Dallenbach Test*; see also* Dallenbach 1st Decl. ¶¶ 4, 7. Although generally speaking there is some superficial similarity between the architecture sphere of Defendant Archcon Architecture and the design-build sphere of Plaintiff Arch-Con Construction, the evidence reflects that the actual products and services offered by each entity are quite distinct. Indeed, Plaintiff Arch-Con Construction does not perform architectural work, while that is the entirety of what Defendant Archcon Architecture offers. Accordingly, this factor weighs in Defendants' favor and against granting an injunction.

---

[2] At the hearing Plaintiff cited evidence reflecting that it sometimes signs contracts as "Arch-Con," as opposed to "Arch-Con Construction," and that on a few occasions clients have referred to the company simply as "Arch-Con." On the whole, however, it appears that Plaintiff uses the full name "Arch-Con Construction" when conducting business and that instances of the use by Plaintiff or others of only "Arch-Con" are more of an exception than the rule.

4. <u>Retail outlets/identity of purchasers.</u> The next digit involves the identity of the retail outlets or service facilities and the identity of purchasers of the product or services. *Sun Banks*, 651 F.2d at 318. Here, while both Plaintiff's and Defendant Archcon Architecture's clientele consists of real estate developers and landowners (particularly in Texas), Defendant Archcon Architecture's evidence reflects that the overwhelming majority of its customers are either previous customers with whom it has developed a relationship or referrals from those same previous customers. *See* Dallenbach Test.; *see also* Dallenbach 1st Decl. ¶ 8. Further, a large portion—90 to 95 percent—of Defendant Archcon Architecture's projects are restricted to the niche ministorage industry. *See* Dallenbach Test. Although the evidence reveals that one of Plaintiff's clients, Signorelli, expressed interest in doing business with Defendant Archcon Architecture, the evidence on the whole reflects there is only a slight overlap in potential purchasers, at least at this time. Further, as Defendant Archon Design is currently inactive, there is presently no overlap there. Accordingly, this factor weighs in Defendants' favor and against granting an injunction.

5. <u>Advertising.</u> When analyzing the advertising digit, "a court looks for advertising in similar media as an indication that consumers might be confused as to the source of similar products." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 332 (5th Cir. 2008). "The greater the similarity in the [advertising] campaigns, the greater the likelihood of confusion." *Streamline*, 851 F.3d at 453. There is little evidence in the record demonstrating that the parties advertise in the same media. Archcon Design Build does not currently advertise its services, and it hasn't done so in over a decade. While both Plaintiff and Defendant Archcon Architecture advertise in trade journals, Archcon Architecture—unlike Plaintiff—generally restricts its advertisements to ministorage trade publications. *Compare* Scheurich Test.

(explaining that Plaintiff has been featured in the Aggie100 on at least nine occasions, Texas Real Estate Business, Dallas News, Construction News, and even the Wallstreet Journal) *with* Dallenbach Test. (explaining that Arch-Con Architecture advertises on the internet and in the national trade publication Ministorage Messenger). In fact, Dallenbach credibly testified that he has never come across Plaintiff in either trade publication magazines or at trade association meetings. Unlike Plaintiff, which has an entire marketing team and devotes approximately $1 million per year to building its brand recognition, Defendant Archcon Architecture does not have a marketing staff and expends less than $10,000 per year on advertising. *Compare* Scheurich & J. Matos Test. *with* Dallenbach Test. Accordingly, this digit is likely "minimally probative" of the likelihood of confusion. *See Streamline*, 851 F.3d at 453 (where evidence demonstrates that a defendant engages in "minimal advertising," this digit is "minimally probative" of likelihood of confusion).

    6. <u>Defendants' Intent</u>. The intent inquiry focuses on whether Defendants intended to derive benefits from Plaintiff's reputation. *See id.* There is no evidence that Defendants adopted the "Archcon Architecture" or "Archcon Design Build" marks with the intent to confuse. Dallenbach credibly testified that he was unaware of Plaintiff's existence or its use of the mark at the time these companies were formed. Although Plaintiff argues that the Court should infer intent because Archcon Architecture continued using the mark after receiving the cease and desist letter,[3] "mere awareness" of Plaintiff's mark does not establish bad intent. *See Streamline*, 851 F.3d at 453. There is no evidence in this record that Defendants sought to "pass off" their services as belonging to Plaintiff or capitalize on Defendants' popularity or reputation. *See id.* Dallenbach credibly testified that when Signorelli contacted him after this

---

[3] *See* Dkt. No. 23 at 12.

litigation ensued to inquire about whether he could design a self-storage facility, Dallenbach went to great lengths to clarify that Defendant Archcon Architecture is not associated with Plaintiff. *See* Dallenbach Test. As Dallenbach credibly testified, he is proud of his work and does not desire to trade in on another company's name. *See* Dallenbach Test. Accordingly, this digit weighs in favor of Defendants and against granting an injunction.

7. <u>Actual Confusion.</u> Plaintiff offers no persuasive evidence of actual confusion. Although the evidence reveals that certain individuals and architects may have been confused by the superficial name similarity, "[t]he relevant inquiry is whether use of the mark produces confusion in potential *customers*." *Citizens Nat. Bank of Meridian v. Citizens Bank of Philadelphia Mississippi*, 35 F. App'x 391, 2002 WL 761301, at *2 (5th Cir. 2002) (emphasis added). There is no evidence that Plaintiff's client Signorelli was ever confused by the two companies. According to Dallenbach, Signorelli was interested in Defendant Archcon Architecture's services after receiving a referral from one of *Defendant Archcon Architecture's* clients. And, as Scheurich conceded, Signorelli expressed a desire to do business with Archcon Architecture even after learning that the companies were not associated with one another.

The record includes perhaps one instance of customer confusion—involving Hines—which was only fleeting and was easily cleared up by Scheurich over the phone. *See Streamline*, 851 F.3d at 457. In this inquiry, "not all confusion counts: evidence of actual confusion must show more than a fleeting mix-up of names; rather it must show that the confusion was caused by the trademarks employed and it swayed consumer purchases." *Id.* (quotations and brackets omitted). Plaintiff is unable to produce a single instance of *actual confusion* in the past 13 years—*i.e.*, confusion caused by the trademarks employed that then swayed a purchase decision. This strongly refutes any likelihood of customer confusion. *See Soc'y of Fin. Examiners v. Nat'l*

*Ass'n of Certified Fraud Examiners In*c., 41 F.3d 223, 228 (5th Cir. 1995) (12 instances of actual confusion over a five-year period refuted the likelihood of confusion).[4] Finally, any other alleged instances of confusion—such as concern by a gentleman named Chris Heath that the mark similarity *might* cause architects to believe Plaintiff is now entering the architecture space, causing them to refer clients to Plaintiff's competitors[5]—is mere speculation. *See Booklab, Inc. v. Jensen*, No. A-07-CA-536-LY, 2009 WL 10669209, at *7 (W.D. Tex. Dec. 4, 2009) (stating, "speculation is not enough to show actual confusion").

This digit, therefore, weights against an injunction.

       8.    <u>Degree of care exercised by potential purchasers.</u> Finally, the high level of care exercised by the parties' respective consumers and the amount of money involved in the types of customer transactions involved here indicates a low risk of confusion. Potential consumers are sophisticated land developers or owners who conduct protracted negotiations—sometimes represented by counsel—before signing contracts for projects valued in the thousands—sometimes millions—of dollars. *See* Scheurich & Dallenbach Test. Such "professional and institutional" purchasers "are virtually certain to be informed, deliberative buyers." *Springboards*, 912 F.3d at 817 (quotations omitted). Further, as Scheurich conceded at the hearing, no client has ever been "stuck in a deal" with the wrong company. This level of sophistication—combined with Scheurich's candid, honest concession—weighs strongly in Defendants' favor and against awarding injunctive relief at this time. *See TCPIP Holding Co. v.*

---

[4] *See also Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir. 1980) (noting that three instances of actual confusion after nearly fifteen years of extensive concurrent sales raised "presumption against likelihood of confusion in the future"); *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986) ("In light of the concurrent use of the [two marks] for seventeen months, Oreck's inability to point to a single incident of actual confusion is highly significant.").

[5] *See* Dkt. No. 58, number 5.

15

*Haar Commc'ns, Inc.*, 244 F.3d 88, 102 (2d Cir. 2001) ("The more sophisticated the consumers, the less likely they are to be misled by similarity in marks."); *Blue Bell Bio-Med. v. Cin-Bad, Inc.*, 864 F.2d 1253, 1260 (5th Cir. 1989) ("The record indicates that the care with which hospitals purchase medical carts, including field testing of any unfamiliar product, makes it unlikely that a facility might inadvertently pick up a brand they did not mean to purchase.").[6]

In sum, weighing the eight digits of confusion together in light of the particular facts and circumstances involved, as well as the mark in the context of how the customers would perceive it in the marketplace, the undersigned finds that the evidence presented is insufficient to demonstrate a likelihood of confusion between the companies. *See Streamline*, 851 F.3d at 453; *see also Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009) (explaining that the likelihood of confusion is typically a question of fact). Without a sufficient showing on the likelihood of confusion, Plaintiff cannot establish a substantial likelihood of success on the merits to justify injunctive relief.

Having found that Plaintiff has not clearly carried its burden on at least one of the four requirements for injunctive relief, the request for a preliminary injunction could be denied on this ground alone. *See Nichols*, 532 F.3d at 372. In the interest of completeness, however, the undersigned will briefly address the remaining injunction requirements.

*Factor 2: Threat of Irreparable Injury*. Plaintiff has also failed to establish that if the requested injunction were not to issue, Plaintiff would suffer imminent, irreparable harm. As Scheurich conceded, he cannot name a single customer that Plaintiff has lost as a result of

---

[6] *See also Continental Plastic Containers, Inc. v. Owens Brockway Plastic Prods.*, 141 F.3d 1073, 1080 (Fed. Cir. 1998) (finding confusion "very unlikely" where the sales "are likely to be the culmination of long-term negotiations, direct communication between the parties, and ongoing contact"); *EA Eng'g, Sci., & Tech., Inc. v. Envtl. Audit,* Inc., 703 F. Supp. 853, 858 (C.D. Cal. 1989) (same).

Defendants' use of the mark. In fact, the evidence reveals that in the last five years, Plaintiff's revenue has more than tripled, notwithstanding Defendants' alleged infringement. *See* Scheurich Test. This significant increase in revenue alone, along with the fact that no mistaken purchasing decisions have occurred in the 13-year period these companies have been operating simultaneously suggests that Plaintiff has not and will not suffer any imminent irreparable harm in the absence of an injunction. *See, e.g.*, *EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.*, No. CIV. 05-5259(RBK), 2006 WL 892718, at *12 (D.N.J. Apr. 4, 2006) (fact that plaintiff's annual revenue and customer totals increased significantly despite the alleged infringement, combined with fact that no mistaken purchasing decisions were ever made suggested a lack of irreparable harm).

Plaintiff's arguments regarding threatened harm appear to rest on purely speculative, unsubstantiated fears. Things might change in the future, of course. But as Scheurich explained in testimony at the hearing, the concern here is that one or more of Plaintiff's current or potential customers *might* at some point see a sign for Arch-Con Architecture and decide to use its services without first calling Plaintiff. *See* Scheurich Test. Any such speculative claim of potential future harm is insufficient to demonstrate imminent, irreparable injury in these circumstances. There is no evidence here that Plaintiff is doing worse as a business as a result of Defendants' alleged infringement or that Defendants provide inferior services, which could jeopardize Plaintiff's goodwill. Nor is there evidence of any imminent injury that could not be remedied with money damages. *See Healthpoint, Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817, 869 (W.D. Tex. 2001). Absent such evidence there can be no finding of irreparable harm so as to justify preliminary injunctive relief. *See, e.g.*, *Shaw v. Dir., TDCJ-CID*, No. 6:17CV660, 2018 WL 4608602, at *2 (E.D. Tex. Aug. 9, 2018), *report and recommendation adopted*, 2018 WL

4599592 (E.D. Tex. Sept. 24, 2018) ("Mere speculation or conclusory allegations of an irreparable injury is insufficient.").[7]

*Balance of the Equities: Weighing the Threatened Injury (Factor 3) and Whether the Injunction Would Disserve the Public Interest (Factor 4).* The third and fourth *Callaway* factors also counsel against granting the injunction. As discussed above, there is little, if any, evidence of imminent irreparable harm to Plaintiff should an injunction not issue. In contrast, Dallenbach credibility testified that an injunction would be "devastating" to Archcon Architecture. It would require him to amend all of Archcon Architecture's written materials, which would be extremely difficult due to the company's limited staff and busy workload. Dallenbach further testified that a name change at this time would cause him to lose customers. Accordingly, this consideration favors Defendants. *See, e.g.*, *DS Waters of Am., Inc. v. Princess Abita Water, L.L.C.*, 539 F.Supp.2d 853, 863 (E.D. La. 2008) ("The third factor requires the plaintiff to establish that his irreparable harm is greater than the hardship that the preliminary injunction would cause the defendant."); *Tricon S.S. Agency, Inc. v. Tricom Shipping Agency, Inc*., No. CIV.A. 86-2596, 1987 WL 5605, at *3 (E.D. La. Jan. 21, 1987) (explaining in trademark infringement action that

---

[7] *See also Healthpoint, Ltd. v. Ethex Corp*., 273 F. Supp. 2d 817, 869 (W.D. Tex. 2001) ("Assertions of injuries not supported by evidence fail to establish clearly irreparable harm."); *iFreedom Direct Corp. v. McCormick*, No. SACV16470JLSKESX, 2016 WL 9049647, at *5 (C.D. Cal. Jun. 15, 2016), *aff'd*, 662 F. App'x 550 (9th Cir. 2016) ("In the trademark context, courts have held that general and speculative assertions as to irreparable harm—like those adduced here by Plaintiff—are insufficient to justify preliminary relief."); *Raoul Beauvoir v. Dingle*, No. SACV1202011CJCJPRX, 2013 WL 12114021, at *3 (C.D. Cal. Sept. 16, 2013) ("The Court does not credit Plaintiffs' conclusory assertion that Mr. Dingle's infringement is causing irreparable harm to their 'business and goodwill.' They have offered no proof (and have not even alleged) that the product bearing the JuJu Jerky trademark produced by JJFI over the last three years has been inferior in any way, or that JJFI is now doing worse as a business as a result of Mr. Dingle's alleged infringement. Absent such facts, and in light of the fact that Plaintiffs have gone three years without a single sale of jerky, the drastic remedy of a preliminary injunction is not justified.") (citations omitted).

"[t]he degree of irreparable harm to [plaintiff] should be considered vis-a-vis the expense to [defendant] in effecting necessary changes if it were enjoined from using its name"). Finally, where, as is the case here, Plaintiff has failed to demonstrate the likelihood of success on the merits and irreparable injury, the public interest factor favors Defendants. *See Vista India v. Raaga, LLC*, 501 F. Supp. 2d 605, 625 (D.N.J. 2007).

For all these reasons, Plaintiffs have failed to "clearly carr[y] the burden of persuasion on all four [*Callaway*] requirements," and the "extraordinary remedy" of a preliminary injunction is not appropriate. *See Nichols*, 532 F.3d at 372.

## Conclusion

For the reasons discussed above, the undersigned recommends that the Motion for Preliminary Injunction, Dkt. No. 5, be **DENIED**.

Notwithstanding the foregoing, nothing in this Report and Recommendation should be seen as a ruling on the merits of Plaintiff's claims at this early stage.

## Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy by certified mail, return receipt requested, to those not registered. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The objecting party shall file the objections with the clerk of the court, and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; the

district court need not consider frivolous, conclusory, or general objections. A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149-52 (1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to timely file written objections to the proposed findings, conclusions, and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**IT IS SO ORDERED**.

SIGNED this 1st day of February, 2019.

_____
RICHARD B. FARRER
UNITED STATES MAGISTRATE JUDGE